**UNITED STATES v. TIMKEN ROLLER BEARING CO.**

No. 24214.

United States District Court
N. D. Ohio, E. D.
March 3, 1949.

Luther Day, of Cleveland, Ohio, and John G. Ketterer, of Canton, Ohio, for defendant.

FREED, District Judge.

The instant action was brought by the United States under favor of Section 4 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 4, to prevent and restrain the continuing violations of Sections 1 and 3 of the Act, 15 U.S.C.A. §§ 1, 3. Permanent injunction with adequate protection to prohibit the violations is sought.

The complaint charges, that the defendant and the co-conspirators entered into contracts, agreements and understandings to eliminate competition between themselves and with others, in the manufacture and sale of anti-friction bearings in all the markets of the world, including the United States. It recites that they allocated the respective territories in the world in which each party might manufacture and sell anti-friction bearings and that they prevented one party from selling or shipping anti-friction bearings into the territory allocated to any other party, except in completed articles of manufacture and for replacement bearings in those articles. It further charges that they fixed and agreed upon prices of bearings shipped into the territory allocated to any other party and that they fixed and agreed upon prices of anti-friction bearings sold and shipped to Russia. They allocated the use of the trade mark "Timken" to each of the parties in their respective designated territories and required that the co-conspirators not manufacture and sell bearings, except under the mark "Timken." The agreements required the co-conspirators to surrender to defendant the rights in the name "Timken" upon the termination of the contracts between them. It is claimed, in certain of the designated territories they entered into agreements with other manufacturers to regulate and allocate the sale of anti-friction bearings and they aided and assisted each other in restricting and eliminating in their respective territories competition from others in the manufacture and sale of anti-friction bearings.

Robert A. Nitschke, of Washington, D. C., and George L. Derr, of Cleveland, Ohio, for plaintiff.

It is alleged in the complaint that the combination and conspiracy resulted in un-

reasonable restraint of imports into and exports from the United States. It is further alleged that the current world shortage of anti-friction bearings and decreased European production caused by the war has created large potential export markets for anti-friction bearings of American manufacture. Notwithstanding this, the continuation of the conspiracy and combination will restrain and prevent defendant from seeking and acquiring many world markets with the eventual consequence of reducing its production of bearings and employment of labor.

The factual and legal questions to be determined in respect of the charges of the complaint are posed by the Government as follows:

Within the purview of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, is it illegal for the "defendant and two foreign corporations, which between them manufacture and sell a substantial portion of the world's production of anti-friction bearings, to regulate interstate and foreign commerce by private arrangements embodying the following restrictive practices?

"(a) Allocation, by agreement, of trade territories throughout the entire world, each agreeing with limited exceptions, not to manufacture and sell in the other's territory;

"(b) Imposition by agreement, of price restrictions upon products sold by any party in the territory of another;

"(c) Agreement to exclusively exchange present and future know-how and inventions, patented or unpatented;

"(d) Use, by agreement, of a common trade mark "Timken" in their respective territories, compulsory use of that mark by the foreign conspirators, prohibition against their dealing in products under any other name, and requiring that they cease using the name upon termination of the agreement;

"(e) Mutual co-operation and ·assistance to protect each others' markets and to eliminate the competition of outsiders;

"(f) Participation in foreign cartels which restrict exports by United States producers."

The defendant, The Timken Roller Bearing Co., is an Ohio corporation with its principal offices located at Canton, Ohio. It employs upwards of 16500 employees at its various plants located in Ohio and in Colorado, in the United States and St. Thomas, Ontario in Canada. Its foreign sales are handled by two wholly owned corporations: Timken Roller Bearing and Service, Limited, and The Timken Roller Bearing Co., of South America, Canadian and Ohio corporations respectively. Defendant manufactures tapered roller bearings, alloy steel, seamless tubing and removable rock bits.

British Timken, Limited, named a co-conspirator (hereinafter referred to as British Timken), is a British Joint Stock Company which maintains its plant and principal offices at Birmingham, England. It employs approximately 2400 · workmen and manufactures tapered roller bearings and axle boxes for railroad cars. Its wholly owned subsidiary, Fischer Bearings Co., Ltd., manufactures straight roller bearings and ball bearings.

Societe Anonyme Francaise Timken, also named a co-conspirator (hereinafter referred to as French Timken), is a French corporation with its plant and offices at Asnieres, France. It employs approximately 510 people and manufactures tapered roller bearings.

The assertion of the Government that defendant, British Timken and French Timken dominate the tapered roller bearing market of the world and a substantial portion of the total anti-friction bearing market is challenged by defendant.

The evidence discloses that defendant is "many times over" the largest manufacturer of tapered roller bearings in the world. Its gross sales in 1947 were $77,097,756.00.

According to the figures complied by the Anti-Friction Bearing Manufacturers Association, defendant's percentage of the tapered roller bearing industry in the United States was as follows:

| year | |
| --- | --- |
| 1941 | 71.0% |
| 1942 | 77.9% |
| 1943 | 82.2% |
| 1944 | 80.3% |
| (7 months) 1945 | 78.9% |

Presently defendant's output of tapered anti-friction bearings constitutes 25% of the total production of anti-friction bearings in the United States.

British Timken, during the period from 1927 to date, produced a large volume of all the tapered bearings in England. It manufactured more than 90% in 1927, the percentage decreased to 70%, and later returned to more than 90%. It produces approximately 20% of all the British anti-friction bearings. British Timken's sales including those made by its subsidiary, Fischer Bearings Co., Ltd., totaled $14,-700,000 in 1947.

French Timken manufactures about 80% of the tapered bearings in France, which constitutes 10% of all the anti-friction bearings. Its sales in 1947 totaled $2,274,-723.

Command of such volume of business spells out the dominant position of defendant, British Timken and French Timken both in the tapered and anti-friction bearing industry. Oxford Varnish Corporation et al. v. Ault & Wiborg Corporation, 6 Cir., 83 F.2d 764, U. S. v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107.

It was aptly stated during the trial that practically every shaft that turns and every vehicle that rolls is dependent on anti-friction bearings. Their crucial importance to our present industrial economy requires no demonstration. Modern machinery, such as trucks, automobiles, farm machinery, locomotives, aeroplanes, in fact every product which has rotating parts, relies on anti-friction bearings for continued operation.

Friction bearings and anti-friction bearings have distinctive characteristics. Friction bearings slide over the shaft and depend solely on oil or other similar substance to reduce friction. Anti-friction bearings, on the other hand, consist of a circular group of steel rollers or balls revolving between two circular raceways which reduce friction between moving mechanical parts.

There are two general types of anti-friction bearings: roller bearings and ball bearings. Tapered roller bearings are a style of roller bearings.

While tapered bearings compete with other types of anti-friction bearings and to a much lesser extent with friction bearings, tapered bearings, because of their design and applicability for particular use, enjoy freedom from competition, just as for certain definite uses, ball bearings are free from competition.

They constitute a distinctive type of anti-friction bearing which fulfills a requirement not supplied or satisfied by others. Whatever competition exists between the different types of anti-friction bearings, is present only up to the point of the adoption, in the design of a specific type of bearing in the proposed equipment or machinery. Once that particular type of bearing is incorporated, other types cannot be substituted for replacement. The replacement bearings must be of the same size and character.

The original installations constitute approximately 95% of the output of roller bearings and the replacement sales the balance of 5%.

In our highly mechanized industries, roller bearings serve as vital links in the chain of their assured existence and sustained progress. Defendant, British Timken and French Timken exercise· a potent force in the making and marketing of these products, essential to the maintenance of the economic welfare of the United States and of the entire world.

In order to view the conduct of defendant in the proper perspective during the period of time when it is accused of violating the antitrust laws, it is essential to examine its prior activities which the Government claims culminated in the agreements, contracts and understandings to eliminate competition, assailed in this action.

On June 16, 1909, the first of a series of written agreements, licensing the production and distribution of tapered roller bearings was concluded between defendant and Electric & Ordnance Accessories Company Limited (a predecessor of British Timken and a subsidiary of Vickers Ltd., a British trust comprised of many companies and described as manufacturing everything from battleships to baby carriages). Un-

der its provisions defendant granted to E. & O. A. the exclusive license to "make, use, exercise and vend" in the United Kingdom and the Isle of Man roller bearings of all kinds made pursuant to the specifications of British patents which defendant then owned or under patents later to be granted to or acquired by defendant. It contained definite territorial restrictions. Defendant was prohibited from making or selling to others or from licensing others to do it, or from selling its own manufactured bearings for shipment into the territory of E. & O. A. It was, however, permitted to make and sell or license others to make and sell bearings for vehicles manufactured outside and shipped into the territory of E. & O. A.

E. & O. A. was prohibited from selling bearings outside of its territory and from selling bearings in its territory, knowing them to be for shipment outside. E. & O. A. was allowed to sell bearings in its own territory for vehicles manufactured there for export elsewhere. The license was so conditioned that E. & O. A. was prevented from manufacturing or selling any anti-friction bearings, except those made under the licensed patents and except those assembled in other articles produced or sold by E. & O. A. E. & O. A. was obliged to use the designation "Timken" exclusively on all the bearings made or sold by it. It was incumbent on E. & O. A. to use all the instructions for manufacture given to it by defendant which defendant agreed to supply. Defendant in turn was privileged to utilize any improvements made by E. & O. A. in its manufacturing process. E. & O. A. had the right to determine the sale price for its bearings, provided that the deficiency between its lowest price and the lowest sale price of defendant would not be in excess of the United States tariff chargeable on the bearings from any part of E. & O. A.'s territory.

In another agreement executed on the same day defendant granted to E. & O. A. the full and exclusive right to "license and authority to make use exercise and vend" roller bearings of all kinds under certain French and Russian patents and under a German patent application as soon as the patent or other equivalent grant shall have been obtained in the territories covered by the patents. It provided that so long as the agreement is in force, E. & O. A. shall have "full and exclusive right license and authority until all the said Patents shall have been granted or after all or any of the said Patents shall have ceased to exist (but only so far as the Licensor can then lawfully do so) to make use exercise and vend articles embodying the subject matter of such Patents or Patent and Roller Bearings of every kind whatsoever in that part of the said territory where the Patents or Patent shall not have been granted or shall have ceased to exist."

Defendant also granted to E. & O. A. an exclusive license to manufacture and sell articles, embodying the subject matter of the British patents referred to in the first agreement and roller bearings of every kind whatsoever (whether covered by patents or not) throughout Europe (except the United Kingdom, France and Russia and except Germany after the patent or grant shall be issued or made there) and throughout the whole of the British Colonies, Protectorates and Dependencies except Canada. It contained the identical restrictions set forth in the first agreement in respect of sales in the other party's territory. The provisions of the first agreement pertaining to price regulations, to the compulsory use of the mark "Timken" by E. & O. A., to the requirement that E. & O. A. use instructions as to method of manufacture, to the furnishing of data by defendant, to the privilege of defendant to utilize improvements made by E. & O. A. were embodied in the second agreement in identical language.

The agreements of June 16, 1909, were modified on April 6, 1920, by two separate instruments between defendant and Wolseley Motors of England (another Vicker's subsidiary). The rights of E. & O. A. were assigned to Wolseley. The territorial divisions remained as they had been designated. The respective areas were redefined as licensor's area (defendant) and licensee's area (Wolseley). Defendant was permitted, however, to sell to manufacturers in defendant's territory who, in turn, were allowed to export bearings to Wolseley's territory for use in their products. Wolse-

ley was granted the same privilege in its territory.

The price for replacement sets for use in Ford cars in Wolseley's territory was fixed. Defendant and Wolseley placed on record their desire and intention, that bearings made in their respective territories "shall not be sold at prices which shall be unreasonable and unfair to the party in whose territory the Roller Bearings are sold" without accepting any legal obligation for it.

The modifying agreements further provided, that if the principal agreement (June 16, 1909) should be rescinded, Wolseley should abandon the use of the name "Timken" as part of its name (if so used) and in all other respects, and secure to defendant the exclusive use of the name "Timken."

In 1924 and 1925 after all the basic patents pertaining to the tapered roller bearing had expired, two agreements were executed between defendant and British Timken. They merely modified the prior agreements and continued them for a term of five years to January 1, 1929. In the meantime British Timken succeeded to the rights of Wolseley Motors (its parent company). Royalties payable by British Timken were reduced from fifteen per cent to five per cent. They recited that the name "Timken" should belong exclusively to defendant and that during the continuance of the principal agreements as modified from time to time British Timken should be deemed to be using it as a part of its exclusive license and upon the expiration of the agreements British Timken should change its name and do everything necessary to secure for defendant the exclusive right to the name "Timken."

These various agreements constituted the basis of relations between defendant and British Timken, including its predecessors E. & O. A. and Wolseley Motors; subsidiaries of Vickers. Against the backdrop of these prior relations we must view the conduct of defendant to resolve the questions raised by the charges of antitrust violations beginning in 1928.

As to the existence of these license contracts, which contained restrictions of territories, fixing of prices, covenants of defendant and British Timken not to compete with each other there is no dispute. The only comment of defendant in that regard is that, "Vickers in its zeal to protect itself may have exacted too broad a license."

The Government points out that in 1927, prior to the time defendant and British Timken associated in their challenged conduct in the bearing industry they were prosperous and growing concerns. This is amply supported by the evidence.

Since it was founded, defendant has held a commanding position in its field of manufacture. By 1928 it became the Titan of the roller bearing industry. It had purchased the assets of its principal competitors in the United States. Conflicting claims were made, during the trial, as to the exact percentage of the total tapered roller bearing market controlled by defendant. It is of no moment what the precise figures were. Defendant's assertions that it was "many times over the largest manufacturer of tapered roller bearings in the world" and that "Timken Tapered Roller Bearings are standard equipment in a majority of all makes of automobiles, trucks and busses. Railroad cars and locomotives, steel mill roll necks, machine tool spindles, oil field machinery, compressor crankshafts, paper making machines—these are but a few of Industry's tough jobs in which Timken Bearings have become dominant" are sufficient indication of the position of defendant in the industry.

Although defendant in its advertising characterized itself and its product in this fashion in 1941, its relative position was the same in 1928. British Timken's potent leadership in the industry compared favorably with that of defendant. It showed a substantial growth from the time the principal contracts were made and increased its productive capacity, experience in manufacture and sales output to an extent, that it became a potential formidable competitor in the field of roller bearings. It experienced a relatively greater growth in the business than did defendant. It had but one competitor in Great Britain and sold approximately 90% of all the tapered roller bearings there. So the accused agreements between 1928 and 1938 were made between two manufacturers, who, on the basis of the

evidence, were properly characterized as the largest manufacturer in the world and the largest manufacturer in Great Britain, respectively.

Around 1926, Michael B. U. Dewar, an English businessman, became vice chairman of Wolseley Motors. British Timken was then a subsidiary of Wolseley Motors. As a member of a British commission, while on a visit to the United States to make an economic study, he spent some time at defendant's plant, in 1927, shortly after his return to England, he became interested in personally acquiring British Timken. As an officer of Wolseley Motors, he knew of the existing agreements between defendant and British Timken, of their provisions pertaining to territory, royalty and trade mark. He also knew that the contracts were to expire on January 1, 1929.

On March 10, 1927, Dewar wrote to defendant's president, advising that he had become chairman of British Timken and raising the question of the continuation of the existing agreements between British Timken and defendant. In this letter mention was made that he contemplated making an offer to Vickers for the purchase of British Timken and expressed the thought that it would require about £300,000. He commented, "I do not know whether your Company would care to be interested if I were to make such an offer either permanently or on the basis of the money loaned being repaid out of profits."

On March 28, Dewar cabled defendant, inquiring whether it would be prepared to extend its agreements with British Timken for ten years, if he were to take it over and stating that he had to make up his mind within the next ten days and should like to do it, but did "not think it wise without a ten year's arrangement with" defendant.

Defendant cabled Dewar in reply, that it was willing to consider an additional ten year license and reduction of royalty, that with its co-operation costs could be reduced 25 per cent or more and further saying that it would be more interested in joining with him in purchasing the British company from Vickers.

Additional cables and personal negotiations between an executive of defendant and Dewar followed, which eventuated in a written instrument named, "Heads of Agreement" dated May 16, 1927, signed by defendant and Dewar. It was in effect a memorandum of the concurrence of the parties on the basic subject matters of the negotiations to be later "embodied in more formal documents as soon as practicable."

Inter alia, it provided that defendant would contribute £52,500 and Dewar £47,500, for the purchase of the stock of British Timken; that upon the issuance of two classes of shares Dewar would hold the majority of the class which controlled the company; that such control would cease in the event a stipulated minimum net profit was not earned and a specified dividend was not paid periodically; that Dewar was to be the managing director while the shares he owned controlled the company.

The contract likewise provided that a new agreement would be entered into between defendant and British Timken "extending for ten years the terms of the existing Agreements between them subject to modifications and generally upon such terms and conditions to be mutually agreed" including among others, "Any practicable steps to be taken for the protection of the name Timken and securing the exclusive reversion of the name in all countries to the American Company at the termination of the Agreement."

The control of British Timken accordingly passed from Vickers to defendant and Dewar. Each owned about 50 per cent of the stock, but Dewar was the managing director and conducted its affairs.

Under these recited circumstances and following these preceding events, British Timken, defendant and French Timken made a series of agreements and engaged in a course of conduct which are labeled by the Government, "a broad combination and conspiracy to suppress all competition between the parties * * *."

What were these agreements and what did these companies do to warrant the charge leveled against them?

On January 1, 1928, a "business agreement" consisting of three written instruments of the same date was made between defendant and British Timken, to be in effect for a period of ten years. Simultaneously all existing contracts between them were cancelled.

The agreement of 1928 followed generally the pattern of those which preceded it. The world was divided into respective territories for the manufacture and sale of bearings in this language: "For the purpose of this Agreement the United Kingdom of Great Britain and Northern Ireland and all other countries of Europe and all colonies or dependencies of said United Kingdom and European countries except in or adjacent to North or South America shall be deemed to be the territory of the British Company and the rest of the world shall be deemed to be the territory of the American Company."

Exclusive license was granted to British Timken under existing or future patents of defendant for the duration of the agreement. In turn British Timken was to assign absolutely and for all time its existing and future patent rights in defendant's territory.

They agreed to inform each other in respect of all inventions and improvements regardless whether they were patented or not patented. Advice as to methods of manufacture was to be furnished by defendant, and British Timken was obliged to follow it.

Each party agreed not to sell bearings directly, or to others for shipment into the other party's territory, except as assembled component parts of completed articles manufactured in its own territory and for bearing replacement purposes in such completed articles. In the event such sales in or into the other party's territory were made, they were obliged to advise each other of the details of the sales and pay an amount of ten per cent of the net sales price.

They agreed to endeavor to maintain the distinctive character of the trade mark "Timken." British Timken agreed not to manufacture or sell bearings except under the trade mark and only in accordance with the provisions of the agreement, and to eliminate the name "Timken" from its corporate name and to refrain from its use as a trade mark upon the termination of the contract.

Prior to 1924, British Timken or its predecessor exclusively licensed a French company La Societe de Mecanique de Genevilliers (hereinafter referred to as S. M. G.) to manufacture Timken roller bearings in France and its colonies. S. M. G. registered the trade mark "Timken" in France and her colonies, where it was the only manufacturer of tapered roller bearings until 1928, when its license agreement was terminated.

Early that year steps were taken by Dewar, with the consent and co-operation of defendant, to organize Societe Francaise Timken (French Timken), which accordingly came into existence in July of 1928. The ownership of its stock was divided between defendant and British Timken. Dewar, however, during the entire time under consideration, controlled its operations and supervised its business activities. French Timken purchased from S. M. G. the trade mark rights in the name "Timken" for 12,000 francs.

A "business agreement" was entered into between British Timken and French Timken, on the model of the one between defendant and British Timken, allocating to French Timken France and her colonies, dependencies and mandates (except those in North and South America) as its exclusive territory for the manufacture and sale of anti-friction bearings.

French Timken rented a plant, purchased machinery from defendant and British Timken and commenced operations by first importing semi-finished products from defendant and British Timken. By 1933 it was engaged in the manufacture of all the component parts of roller bearings.

In Germany, one Prausnitzer, the owner of a company called Deutsche Timken Gesselschaft, had registered the trade mark "Timken." Defendant and British Timken organized a new German company with the same name, gave Prausnitzer a 20-25 per cent interest in it and named him manager in order to acquire the trade mark and Prausnitzer's assignment of his company.

An agreement similar to the one made with French Timken was consummated between British Timken and Deutsche Timken Gesselschaft, which allocated Germany as the German company's exclusive territory for the distribution of anti-friction bearings. In 1934 the German company's business was discontinued and British Timken again took over the territory.

Before the expiration of the 1928 contract, another agreement between defendant and British Timken became effective (on January 1, 1935) for sixteen years, which was substantially the same as the 1928 contract.

In it were found, however, the following provisions: "The American Company [Timken] in its territory may accept and execute orders for bearings for ultimate destination in the British Company's [British Timken's] territory for use for bearing replacement purposes in such completed articles of manufacture but such right shall not authorize sales to or known to be destined for manufacturers in the British Company's territory or sales at prices in conflict with the wishes of the British Company and the American Company from time to time will notify the British Company of the details of the sales authorized under this paragraph and will pay to the British Company an amount equal to five per cent (5%) of the net sale price thereof."

Conversely the same provision is made as to prices and payments to defendant for sales of replacement bearings by British Timken in defendant's territory.

Russia became the joint territory of defendant and British Timken. Business transacted there was conditioned as follows:

"The prices and terms at or upon which offers are made and orders are accepted shall so far as practicable be mutually agreed from time to time but nevertheless either of the parties hereto shall be at liberty to quote and accept orders at low prices and extended times for payment without the consent of the other party after having first submitted the prices and other terms to the other party for its consideration and remarks provided that any such quotation or acceptance shall not involve under cutting some quotation already made by the other party."

The agreement of June, 1928, between French and British Timken was modified in a new contract on July 15, 1935. It too provided that bearing replacement sales might be made by defendant, French Timken and British Timken in and into their respective territories. The prices had to be satisfactory to the company into whose territory bearings were sold. French Timken was obliged to sell no bearings other than under the trade mark "Timken."

The present operations of defendant, British and French Timken in the world market of anti-friction bearings are carried on under the provisions of and subject to the restrictions of two contracts both dated November 28, 1938. They are, the "Tripartite Contract" between defendant, British and French Timken and the agreement between defendant, British Timken and Dewar, which is supplemental to the Tripartite Agreement. These are the final understandings which superseded all the numerous others and are to govern the conduct of the parties until the end of 1965.

The lengthy recital of the contents of the prior agreements was felt desirable for the purpose of showing the evolution of exclusive licenses under patents into agreements which are not based on the prerogatives enjoyed by the limited patent monopoly.

Defendant and Dewar have to date maintained controlling stock interests in British Timken. In 1935 stock was sold to the general public, which resulted in defendant owning 30.25 per cent and Dewar 25 per cent of the shares. Defendant and British Timken own all the stock of French Timken.

Considerable testimony was offered to explain the reasons for the making of the large number of contracts, why they were modified and extended from time to time and various covenants were inserted in them and why the present contracts have such long duration. In the basic questions involved, the reasons advanced are of no significance. The controlling facts are that they were made and that they contained certain provisions which may bring them

under the condemnation of the Sherman Act.

The 1938 contracts are each entitled "Business Agreements" and contain substantially the same provisions present in the 1935 agreements.

To summarize their salient features, the contracts provided for exclusive marketing areas which prevented the parties from selling in each other's territories, fixed prices on all replacement bearings sold in each other's territories; fixed prices on bearings sold in Russia and compelled British Timken and French Timken to manufacture and sell bearings only under the terms of the agreements and under the trade mark "Timken."

The evidence is overwhelming and uncontradicted that defendant, British Timken and French Timken religiously adhered to their contractual obligations to make the territorial divisions inviolate. Indeed, in some instances they refused to disturb the allocated territories even where exceptions were made in the agreements. For example, although the contracts permitted sales of replacement bearings outside of the allocated territory D. P. Hess (assistant to the president of the defendant company) confirmed the arrangements he made with British Timken in a memorandum on February 16, 1932 as follows:

*"Prices on Service Bearings Into Our Territory*

"Arrangements completed to effect that British Timken will not quote on any inquiry coming in and state product should be obtained from us. There are two exceptions to this:

"(1) When customer demands British product.

"(2) When S. K. F. or F. S. are in competition.

"Both the latter are quoting 70 off on the Continent and we are having our trouble.

"Hong Kong will be American territory starting at once."

Each of the parties refused orders for shipment outside of its territory, referring them to the company in whose territory they were to be used. During the period from July 1, 1945, to February 20, 1947, alone, defendant transmitted 402 inquiries or orders to British Timken and French Timken. In each instance the customer who placed the order was advised that either British or French Timken had the exclusive right to supply the bearings.

The steady and persistent effort to assure the exclusive right of each party to manufacture and sell in its own domain is emphatically illustrated in the various letters and memoranda of the officers of the contracting parties and particularly of the officers of defendant. They bear out the Government's contention that the respective trade provinces were to be preserved regardless of the unsatisfied demand for bearings in the various parts of the world. Over the entire span of years during which the restrictions existed, the parties did not deviate from their course of conduct. Even when the world gradually became engulfed in armed conflict, provisions were made to supply customers by specific arrangements so as to retain the trade division.

In 1929, the Ford Motor Company attempted to purchase a quantity of tractor bearings from defendant for use in its Cork, Ireland plant, which was in British Timken territory. Defendant, instead of filling the order, made the bearings, and shipped them to British Timken for resale to Ford. In that connection Hess wrote:

"This is causing us, frankly, a great deal of changing in our plan of operations, as it meant putting all of this type of machinery to making these large bearings, on double shift and operating them seven days per week; but we feel that you need this help very badly at the present time, and our joint efforts must be made to keep competition out of this Ford situation.

"You may be interested to know that the Ford Motor Company, Detroit, upon receiving advices that your deliveries were not satisfactory, from their English and Cork representatives, immediately placed an order with us for approximately 5,000 sets of bearings, and of course they would have to pay our prices for them. We felt this would be a very serious handicap to

your future sales, as they would constantly hold up the fact to you and possibly to us, that you could not handle their production after we had used our efforts, as you know, successfully, to have them turn over this entire production to you.

* * * * * *

"We are shipping these bearings to Ford, Cork, Ireland, freight prepaid, and are going to bill you your selling prices to Ford. * * *

"As you understand, these prices for the differential bearings in particular, are very materially below the prices that we sell Ford, and these quotations to you must be held in strictest confidence, as we certainly would be asked to explain the difference in prices we bill to Ford and the prices to you; and our explanation of this would be that we are billing you such prices on account of the close relationship between the two corporations, and that the British Timken Company is standing whatever losses may be incurred."

On December 5, 1939, L. M. Klinedinst (vice president of defendant) wrote to all interested employees of defendant as follows:

"Since the turmoil in Europe certain situations are arising that make it necessary for each and every one of our key men to thoroughly understand the setup between British Timken Limited, Birmingham, England, and The Timken Roller Bearing Company, Canton, Ohio.

* * * * * *

"The contract provides that we shall not ship or knowingly permit our customers to ship bearings into their territory for use in the manufacture of any equipment whatsoever. Where customers wish us to make shipments into their territory for manufacturing purposes, we are to advise them of our arrangement with British Timken Limited and you are to immediately advise us of such conversations, negotiations, etc., so that we can in turn contact the British Timken Company.

"Undoubtedly many of our manufacturing customers buy bearings from us for service purposes and occasionally for manufacturing purposes and in turn re-ship them

into British Timken's territory. That, of course, we have no knowledge of and we cannot stop.

* * * * * *

"There are a number of American manufacturers using Timken bearings who operate plants in British Timken's territory. Some of these plants have used both SKF tapered roller bearings and Timken bearings. Inasmuch as it is becoming more and more difficult to secure anti-friction bearings from the Swedish companies, these American manufacturers who own these foreign plants will probably call on us to make deliveries of bearings from here. Please note that such deliveries are in direct violation of the British Timken contract, and where such requests are made refer them to us as we may want to effect some arrangement with British Timken to fill such requirements rather than have the American company buy one of the competing makes of tapered roller bearings and have them shipped into British Timkin's territory. In such an event, both companies would lose."

Again on December 6, 1939, in another communication he wrote:

"It is our interpretation of these arrangements that we are not permitted to sell or ship bearings into or known to be destined to British Timken's territory without paying them a 5% commission, and even under such circumstances our prices must be acceptable to them. We have a mutual understanding with British Timken that on unsolicited inquiries for bearings going into each other's territory that we are at liberty at all times to quote prices representing a 50% discount from American list on standard bearings and pay a 5% commission on the net sale thereof. We insist that all of our men respect our agreement with British Timken and on any unusual cases to consult the Home Office for further instructions."

On January 29, 1940, in "Inter-Organization Correspondence," W. R. Timken (vice president of defendant), referring to Klinedinst's letters, reiterated their contents in this manner:

"In view of the confused conditions of international trade and the increased de-

mands of the British and French governments for bearings for war purposes, it is probable that we will receive more and larger inquiries for bearings destined for the territories of our British and French associates. We have also had reports that companies using SKF bearings are having difficulties in getting deliveries, and this, too, may be a factor in our receiving inquiries for delivery in the territories of our associates.

"Our agreement provides that we are not to sell bearings into Europe or possessions of European countries, excluding Russia and North and South America, except for service, and in the case of service, only under certain price conditions. Our agreement does *not* permit us to sell original equipment bearings directly or to domestic manufacturers knowing them to be destined for shipment into British or French Timken territories. However, this does not include bearings assembled into completed articles of manufacture or component parts of completed articles of manufacture subsequently shipped into their territory.

"When inquiries are made for bearings which may be shipped into our associates' territories, please report the matter immediately to Canton giving full information as to number, size, quantity, specification, and the exact use of the bearings. In addition, you should use your best efforts to persuade the customer that our British and French associates are both able and eager to supply their foreign requirements and that they manufacture a product comparable in every way to our own.

"When emergency shipment of small orders is demanded, we have the permission of our associates to fill such orders. We do not, however, wish to take advantage of this permission except where it is unavoidable. These cases must be taken up with Canton as outlined above for it is necessary that complete information be given to the associate involved. Should the Canton office see fit to fill any such orders that does not mean we will continue to accept them, and the customer should be urged to place all future orders with British or French Timken as the case may be."

A report from R. E. Forsythe (assistant to the president of defendant) to Klinedinst on December 3, 1940, entitled "Sales Into British Timken's Territory," described the temporary arrangement precipitated by the war. He said:

"* * * It had not been our practice in the past when we shipped bearings for British Timken directly to their export customers to give them a discount from our standard established prices such as we gave them when the bearings went to Birmingham, but they asked that we now do so due to prevailing circumstances. In other words, when we made shipments to their customers direct, they would advise us the prices at which the material should be charged and then we were to credit British Timken's account with the difference between the amount received from the customer and the price we would ordinarily have charged British Timken had the bearings gone to Birmingham.

"We agreed to do the above on a temporary basis, reserving the right to rescind the price concession at our discretion, and in this connection British Timken was to guarantee the credit of their agents so long as we followed their instructions regarding terms of shipment.

"Since the time that hostilities broke out in earnest in Europe we have continuously received inquiries emanating from British Timken's sales territory requesting catalogs and prices on our bearings. In many cases we were advised that they had formerly been supplied their Timken bearings from Birmingham, but they now desired to establish an American source of supply in case they could no longer secure bearings from England, and in some cases these inquiries came from British Timken distributors and French Timken agents. We have either referred the inquiries to Birmingham, or if it were a specific inquiry covering a definite lot of bearings we quoted our protective discount of 50% off American list. We have received definite orders from their sales territories which upon being referred to British Timken were turned down at their instructions.

* * * * * *

"Mr. Winspur [of the British Purchasing Commission] advised me more or less confidentially that he had learned that all

orders from Bearing Service Company in Australia had to be placed through Birmingham due to contractual relations and stated that he felt it would be necessary for the Australian Government to probably take over these orders and place them through the British Purchasing Commission. In discussing this with Mr. Harrison a few days before he left Canton, he asked if we would cover them in the amount of 5% on such sales inasmuch as they had the defense contract, but we made him absolutely no promises of any kind.

* * * * * *

"We have picked up from several sources in the United States the story that The Bower Roller Bearing Company is making every effort to take advantage of present conditions in order to establish themselves in world markets, and such conditions as described above only serve to give them an entree into these fields. We have also heard that SKF is buying Bower bearings and are either re-packaging them or having their name stamped on the bearings and selling them to their regular customers in export markets. Naturally, we feel that present conditions did not add to the prestige of the Timken name and also that Bower who is a dangerous competitor is now being given an opportunity to secure a foothold from which it may be very hard to dislodge them after the war is over."

The strict adherence to the territorial restrictions applicable to Australia became a matter of grave concern to British Timken's distributors and eventually to the British Purchasing Commission. There was a serious interference in Australian war production due to British Timken's inability to supply bearings. The threat of sales by competitors to supplant the meager amount of available bearings and the clamor of Australian distributors eventuated in the relaxation of the theretofore inflexible provisions of the contracts. For the period of the war emergency, defendant was permitted at first to fill only Australian orders and later orders emanating from any place in British Timken's territory, but only through British Timken's distributors and only at prices designated by it.

The voluminous correspondence on the subject matter bears out the critical situation which existed and which required the reluctant alteration of established policy.

For example, on September 20, 1940, C. S. Gibson (technical representative of British Timken at Melbourne), in a letter advised Forsythe of the proposed visit of an official of Roller Bearing Service Company of Australia to Canton and further said:

"* * * It seems impossible to rely on Birmingham to efficiently handle orders, and of course, neither I nor our Distributors are officially allowed to correspond with you direct, Mr. Harrison will, I expect, give you details of lots of other matters which have been held up unduly, but I pointed out to him that possibly you may not be able to help him much, as this territory is controlled by British Timken Ltd., * * *

"On the other hand, you will appreciate the rather absurd position existing at the present moment, inasmuch that we are getting practically all our supplies from you, and yet it is almost impossible to get any information from Birmingham. Why not take over Australia and New Zealand for the duration of the war? I hope that you have been asked by Birmingham to quote for the complete equipment of 20 alternatively 35 locomotives and tenders for the New Zealand Railways. This is a case where the customer is extremely anxious to place the order with us, but for some extraordinary reason, we do not seem to be able to produce a price."

R. R. Thomas of Bearing Service in writing to Forsythe commented:

"Our cable to Mr. Harrison may have been a little difficult for you to understand but we are engaged at the moment in replying to a cable from Mr. Pascoe and we are very concerned to make sure that Mr. Harrison does not ask you specially to request that our orders go direct to Canton and then for us, in our enclosed letter, to ask Timken to do the opposite. In other words, we do not want you to think for one moment that we would ever let you down in the slightest particular.

* * * * * *

"I am asking Mr. Harrison to try and meet Mr. Dewar and casually give him a

copy as per our enclosure stating to him that he might wish to make some enquiries while he is in America."

The cable to which he made reference was sent by Pascoe (chief executive director of British Timken and director of French Timken) to Bearing Service reading:

"Canton report confusion caused by receiving requests for deliveries and prices direct from Australia presumably Bearing Service Company Stop This is directly opposite to our instructions Stop How does it occur? Stop Please take immediate steps to rectify."

Subsequently Thomas wrote to Gibson:

"Not only was that opportunity missed but after more than twelve months of war, after large quantities of ball bearings have become available in this country, we still await our first considerable shipment from Canton and we still, in some unfortunate cases convert Timken users back to ball bearings.

\* \* \* \* \* \*

"In some urgent cases we have been reminded by the Ministry of Munitions that we were retarding the Defence program by not supplying information promptly and we were asked whether we were prepared to do something about it or whether they would communicate direct with the British Purchasing Commission.

\* \* \* \* \* \*

"With all respect we request Mr. Pascoe to accept this following recommendation which we make in the light of many years experience of this market.

"(a) That all our orders be forwarded to British Timken, Ltd.

"(b) That in all other matters connected with shipments of goods, we be encouraged to communicate freely with Canton, at the same time sending a copy to Birmingham."

On December 4, 1940, Klinedinst wrote Dewar, who was then in the United States:

"We were advised by the British Purchasing Commission that they will very likely take over all of the purchases of anti-friction bearings for Australia. This will present a problem, the solving of which we must ask your help.

"Undoubtedly as these inquiries come to the British Purchasing Commission they will ask all tapered roller bearing manufacturers in this country to quote prices, and following the same assumption further, they will give the business to the lowest bidder. That is one phase of it. On the other hand, should your Australian distributors specify on their orders that they must definitely be supplied Timken bearings, then, we presume, they would come to only Timken for quotations, or would they take it upon themselves to buy from the cheapest source?

"Regardless of how this works out, we have the problem of what prices to quote and how to distinguish between bearings that are to be used essentially for service and those to be used in production. There is another angle that may enter into this— the Purchasing Commission may go, for instance, to the General Motors Export Corporation for prices on bearings for General Motors equipment and, naturally, there should be uniformity in prices. Surely we feel it is necessary to have two distinct prices if this is possible—one covering bearings for service and the other for production.

"We have in mind a number of American manufacturers who have assembly plants in Australia, and if the British Purchasing Commission takes over that phase of the business those bearing purchases would come through them rather than through the International Harvester Company, or General Motors, or who ever may have plants in Australia.

"We have in mind a situation that developed several months ago. When we quoted the British Purchasing Commission on a large quantity of bearings at the established government buying agency price —#30—our competitor, The Bower Roller Bearing Company, quoted on this same inquiry at about a #17 price and The Bower Company got the business.

"We do not want to see The Bower Company or any other American manufacturer of tapered roller bearings find a foothold in Australia or in any other territories covered by you, but we feel this will happen on a straight competitive bidding proposition because it is not possible to definitely con-

trol the price at which other tapered roller bearing people will sell their products for foreign consumption.

"The simplest way out of this, as we see it, is for British Timken to instruct all of their foreign service connections to very definitely and positively specify Timken tapered roller bearings. That will give the British Purchasing Commission no leeway. If that can be done, the problem is virtually solved.

\* \* \* \* \* \*

"We feel, Mr. Dewar, that the awkward situation now presenting itself might have been avoided had British Timken permitted us to handle their outside orders direct.

"Mr. Harrison of The Bearing Service Company of Melbourne spent quite some time with us recently and was very bitter in his criticism of our deliveries. We found in many cases we had never received an order from British Timken for the sizes so badly needed.

"The policy followed by your Australian people was to send the order to British Timken, they would fill such parts of it as they could, and the balance of it was transferred to us. That meant a very great delay and that was why we suggested sometime ago that you have such parts ordered and shipped direct from Canton."

On December 18, 1940, Gibson addressed a personal note to Forsythe, saying among other things:

"On the 11th December, the following cablegram was received by Bearing Service Co. of Aust. Pty. Ltd. Melbourne from Mr. Harrison. This was sent from Los Angeles on the 10th December:

" 'Canton advise Dewar agreed yesterday their handling Australia direct he cabled Pascoe this effect now awaiting confirmation Birmingham'

"As you can imagine this is some of the best news I have had in years. So far I have not received any advice from Birmingham about it. I feel that Birmingham will do their best to avoid this arrangement, although if Mr. Dewar has agreed to it, half the battle is won. I can think of quite a number of reasons as to why Mr. Dewar would agree, and

no doubt I will hear this story from you in due course.

\* \* \* \* \* \*

"I do not know if you will be taking over this part of the business, and am of the opinion that it is quite possible that Birmingham will want to retain it. Should you be taking it over, it will of course, be necessary for you to compete with prices of ex Ford factories in Canada, and you will know what the position is with them. You may prefer to retain the business in this way, but as you can imagine, I am naturally anxious to have it direct."

The Australian government representatives called on defendant in February 1941 to build a plant in Australia. Wm. E. Umstattd (president of defendant) reported to his associates in a memorandum:

"Mr. Gutteridge, an engineer who has been sent to this country by the Australian Government to negotiate for the establishment of manufacturing plants in Australia, visited us at 3 P.M. with Mr. Chamberlain who is at present Technical Engineer with the British Minister of Munitions in Washington.

"Gutteridge and Chamberlain called on us to see if we would be interested in establishing a bearing plant in Australia to manufacture all types of anti-friction bearings. They said that the anti-friction bearing business in Australia has amounted to about $1,000,000 per year for the past several years, but within the past twelve months this figure has increased approximately 100%. Mr. Gutteridge said that the Australian Government was insisting that a plant be built in Australia and that adequate tariff protection would be given to such an industry.

"I explained to Gutteridge and Chamberlain that Australia was controlled by British Timken and that under no circumstances would we consider building a plant in Australia. I pointed out to them that it would be almost impossible to get delivery on any machine tools suitable for the manufacture of anti-friction bearings and that no bearing manufacturer in this country had excess machinery which could be shipped to Australia. Mr. Gutteridge

wanted to know if we would be interested in establishing a plant in Australia if he could secure priorities for the necessary equipment. I told him that I did not think he could secure such priorities, but if he did we would not be interested as I had previously pointed out that British Timken controlled the sale of Timken bearings in Australia."

The inquiry of the British Purchasing Commission was answered in the same vein by Umstattd:

"Your letter of February 26th has been received.

"When Messrs. Chamberlain and Gutheridge visited us about ten days ago we told them that under no circumstances would The Timken Roller Bearing Company establish a plant for the manufacture of bearings in Australia. We have a contract with British Timken Limited which precludes our establishment of a manufacturing plant in Australia. Such a plant would have to be built by British Timken Limited."

These communications demonstrate that the parties not only sought the preservation of their respective sales fields, but that they supported the agreements by the maintenance of a price fixing arrangements. The protective discount policy insured the parties against competition from each other in replacement bearings. Defendant sold at a 70% discount for export in its own territory, but quoted prices representing a 50% discount from the American list on standard bearings in response to unsolicited inquiries from British Timken's territory.

Other steps were taken to prevent outsiders from disturbing the agreements as the particular situation required.

In January of 1928 D. E. Hobley (sales manager of British Timken) wrote to Hess:

"In Budapest, Hungary, Timken bearings are serviced by Mr. Michael Pal, and he has been doing remarkably good business for us during the last year. In the same city there is a house called Messrs Denes & Friedmann, who are the representatives of the Timken-Detroit · Axle Company through their British connection.

As you know, we have established service prices for bearings identical with your own and operate with the same discounts, but we are much alarmed to find that Messrs. Denes & Friedmann can sell Timken Axle sizes considerably cheaper than our own distributor. * * *

"It seems to us that the Timken-Detroit Axle Co. are taking advantage of their position inasmuch as they buy from you at low prices and ship them over to our territory on a small margin of profit, and this does interfere with our service prices."

In February 1928 Hess replied to Hobley:

"We have finally concluded arrangements with Timken-Detroit Axle Company with reference to the sale of our bearings through their distributors in Europe, and particularly in Budapest, Hungary.

"Mr. Emmett, of the Automotive Products Company, London, is in touch with this situation, and I believe it would be wise for you to call upon him. He will receive instructions from Timken-Detroit to the effect that he should not undersell us or you on service bearings."

They deviated from adherence to protective prices only in cases where competition of outsiders required that it be done.

In June, 1944, E. H. Austin (defendant's manager of Service Sales) wrote:

"Joe Cornell handed me your letter of June 2 which resulted in my discussing this with Mr. Klinedinst. I think before we definitely commit ourselves to quoting 70% on general sizes and 60% on Ford on the orders to which you refer, we better find out just exactly what is involved—bearing sizes, quantities, etc. Perhaps you could tell us a little bit more about Cymot, Ltd., for it is well that we are given what information is available on any of these companies that we give consideration to quoting our export prices in British Timken markets.

"You brought up an age-old subject, namely, the policy that we should employ in quoting on inquiries emanating from British Timken territory. I pointed out to Mr. Klinedinst the weakness in our pricing

policy in the British Timken market, emphasizing the fact that buyers for the B-T market are becoming familiar with the fact that we are protecting British Timken and by so doing, do not have a price that is anywhere near competitive to Bower. As a result, it now develops that we don't even get inquiries for a lot of requirements. They are automatically referred to our competitors. Naturally it cannot be expected that Bower will establish an export policy comparable to ours in territories that we cover and another pricing policy to be in line with us in British Timken territories."

In the joint territory of Russia, the pricing provisions spelled out in the written contracts were carried out to the letter.

The contractual obligations for the interchange of information relating to the manufacture of bearings and of all inventions and discoveries, whether they were patented or not, were construed by defendant, British and French Timken to be for their mutual benefit only, to the exclusion of all others. Accordingly any information pertaining to their manufacture was denied to outsiders unless consent was obtained from the party affected. In December, 1932, Hess wrote Dewar:

"Upon my return to this famous country I find a cable from Birmingham with reference to a statement made by Ford Dagenham that we have granted Ford America a license to manufacture Timken bearings according to our patents, and it puzzled me just a little bit because this is the situation I described to you when I explained that we had dropped the Bower suit and had given Ford such a license as they describe. We, however, explained to them that we could give them no such license for England or any European plant as British Timken was our exclusive licensee and that anything in this regard which they desired would have to be discussed with you."

The inhibition imposed by the contracts on British and French Timken, not to manufacture or sell tapered roller bearings, except under the name "Timken", was observed and both companies throughout the years before and after 1928, to date, have become identified as producers of "Timken" bearings. The goodwill they built up and the competitive position they acquired in the allocated territories was under the name "Timken." The retention of the goodwill and place of dominance in their business field depended on the continued right to use the name. The severance of contractual relations meant the termination of their ability to profit by the many years of experience in manufacture and successful business dealings with their customers. In turn no competitor of British or French Timken was permitted to use the trade mark "Timken."

In addition to dividing the world into restricted manufacturing and marketing areas, maintaining price fixing arrangements, and interchange of discoveries, know-how and inventions to the exclusion of others, defendant, British Timken and French Timken co-operated to shut out the competition of other dealers in tapered roller bearings.

The rigid territorial divisions were followed at all times except when adherence to such restrictions would result in the possibility of loss of business. They were made for the dual purpose of protection against each other and to eliminate the competition of other tapered bearing producers.

Dewar's testimony in this regard was:

"We had a common enemy in the Swedish S. K. F. who had begun the manufacture of tapered roller bearings, and our general policy was that if a tapered roller bearing was sold it had got to be a Timken and not a S. K. F. To us it was really immaterial whether it was made in the United States or whether it was made in Great Britain or France, provided it carried the name 'Timken'. We used to sell at the request of the American Company in the Argentine and the American Company has sold at our request in our territories."

Hobley (in charge of British Timken's sales) commented:

"The whole object of that arrangement was that if clients in our territory insisted on buying bearings from Timken we would let them do so. If there were clients in the Timken Company's territory who wished to buy from Great Britain we would supply them. A commission would be granted in either case. That was in order to combat

competition; that was the whole basis of it."

Klinedinst wrote to Dewar on December 4, 1940:

"We are primarily interested, of course, in keeping Timken bearings to the front during this trying period and the further desire to help you in every way possible since we know how difficult it is to eradicate a competitor in foreign fields after he once gets a start."

W. R. Timken, during the trial, in answer to the question: "What is the procedure that you follow now on orders from British Timken territory?" replied:

"Well, I would say it varies, depending upon what territory it is and whether they can make delivery. Where they can make delivery they would naturally get the business. You see, during the war we felt there was a very great opportunity to improve the Timken position in Australia and the East Indies, due to the fact .that we thought at that time the SKF of Sweden was completely cut off from export, and we were willing to try to undermine their position by any means we could, including selling bearings at a loss if necessary."

The sales of bearings by defendant, British Timken and French Timken, to each other were on a most favorable basis to supplement the plan of strict compliance with the allocated areas and to protect themselves from competition by outsiders. In December, 1929, Hess, in a letter, told Dewar:

"With this situation confronting us we are going to be bothered by rather serious competition from S K F, and the thought has occurred to us that it may be possible for you to supply bearings for our industrial requirements in Canada. According to our records there is a 15% duty on English products as compared with our 30% and, if you can sell bearings at low enough base prices, there is no question but that we can hold—or I should rather say get—a big bulk of this industrial bearing business in Canada."

Dewar replied:

"I should love to help you compete with S.K.F. in Canada. I heard quite casually the other day from a representative of the American motor industry, (who was in London and whom I met but whose firm I do not know) that for their assembly factory in Canada they have placed an order with S.K.F. for bearings which will be manufactured in Luton, as they were able to buy these *taper roller* bearings made by S. K.F. Luton more cheaply in Canada than they can buy yours.

"I do want to take every possible step we can to keep S.K.F. out of the taper roller bearing business anywhere."

In August, 1939, the matter of SKF (a Swedish bearing manufacturer) competition continued to concern defendant and British Timken. Klinedinst wrote Dewar:

"We are having our troubles with the SKF Company not only in this country. but in Canada as well and in many foreign countries such as Japan, South America, and elsewhere due to their making price reductions very far below those that we have ever extended to anyone in their respective field.

\* \* \* \* \* \*

"However, the thought that we have in mind is that we should make a study of the Canadian situation with the thought in mind that perhaps some arrangement might be set up whereby we could be appointed exclusive Canadian distributors for British Timken handling tapered rollers, balls, and straight rollers, not only for service requirements but for new installations as well in all of the various industries. There would be some advantages in this and perhaps many disadvantages. We can see, however, that industrial and service bearings shipped by SKF from Sweden into Canada take a duty of 17½% while they are free from England. This would give us that advantage.

"While this arrangement might not be feasible, it is certainly worth while thinking about, and it appears to us a good club to put over the SKF Company's head."

Defendant and British Timken made certain that the alloy steel made by defendant, especially adapted for the manufacture of bearings, was not made available for use by their competitors.

In a letter in September, 1934, Dewar told Hess:

"The position is one of considerable difficulty because I do not feel inclined to agree to give you carte blanche to sell tubing in our territory; it might conceivably react to our disadvantage if your tubing were sold to our competitors."

Hess, in reply, stated defendant's policy:

" * * * please understand that under no circumstances would we sell our tubing to any one in the world who might as a result harm British Timken, French Timken, or American Timken. We have not yet reached this necessity in merchandising our Steel and Tube product."

The collaboration of defendant, British Timken and French Timken to eliminate competition with each other and to eliminate the competition of other bearing producers was augmented by agreements of British Timken and French Timken with their competitors abroad, to share customers and sales in certain markets and to stabilize prices. Hess referred to the association resulting from the agreement as a cartel in reporting on its success to H. H. Timken (the founder and at the time president of defendant company).

Aside from the cartel arrangement, discussions were had concerning prices between defendant, British Timken and their foreign competitors.

In December, 1932, Dewar wrote J. D. Spray (director and vice president of defendant company):

"I take it that you are trying to improve the price level in the Canadian market. Is it your suggestion that you and ourselves should try to arrive at a general arrangement with SKF regarding quotations to Ford in Canada and at Dagenham, or for other manufacturers in Canada as well as Ford? As I believe you are aware, we have not as yet had to reduce our f.o.r. prices for Canada as low as we have had our prices driven down for Ford Dagenham.

"During Mr. Hess's visit, he told us of certain events on your side of the water. The result of this information has been that we are engaged at present in negotiating an arrangement with SKF to cover orders placed by Ford Dagenham. As the SKF position is at present, their . English Company is only interested in Dagenham. Their Swedish Company is interested in the Canadian market and in all the other places where they assemble cars.

"As you probably know, we have at present practically the whole of the Ford European business with the exception of a percentage in England and with the exception entirely of their German orders. Our proposed agreement for Dagenham will be on the basis of us having 70% and SKF having 30% of the work.

"I would add, in addition, that we hope to come to an arrangement on Service work for all Bearings in England as part of the same arrangement."

Dewar also reported to Hess about a meeting in Paris at which British Timken, R. I. V. (a large Italian bearing manufacturer), and S.K.F. were represented. He said among other things:

"After that I re-iterated that in my opinion—and it was an opinion only as I had no right in any sense whatever to speak for the T.R.B., Canton, and I had no knowledge of what was in their thoughts— I felt that the key to such very close cooperation, as joint manufacturing, lay between SKF, Gothenburg, and the T.R.B. in Canton.

"Mr. Batt then informed us that he had had some discussions of an informal nature with T.R.B. regarding the possibility of stabilising prices in the Canadian market."

Although the cartels were formed without defendant's execution of the actual agreements, they were the result of the understandings and co-operation of defendant with British and French Timken to bring them about. Defendant's territory was affected. It was the beneficiary of their operations. Its officials were in consultation with the officers of British and French Timken concerning them, they prompted and approved the agreements.

In November of 1932 Hess wrote H. H. Timken:

"One thing is very encouraging about the operation of the cartel. Between SKF

and ourselves we have raised prices about 5% and come to a definite agreement as to service prices in France.

\* \* \* \* \* · \*

"Dewar and I have been discussing what to do in case they try to reduce our volume to the quota figure and after considering various plans, we have come to the conclusion to try and hold our present volume (about $400,000.00 sales annually) and in exchange for this higher quota, offer SKF one half of our steel tonnage in France. This seems like a good move and will possibly be quite acceptable to SKF as their steel production in Sweden must be very low at this time."

The report of Hess in September 1933, on his European trip, sheds considerable light on defendant's part in the cartel operation:

"During the current year, real progress has been made in cooperation with SKF to not only stabilize sales prices but to raise them generally, and contracts for the last half, do in many cases, call for a 5% increase in prices. The need for this is vital when we consider the fact that automotive and commercial vehicle sales prices have declined about 30% since 1929. This is due almost entirely to SKF competition but our present relations with them in England are quite cordial and we feel that for the next year we face no further price cuts. This relationship with SKF started with our offering to split the Ford business on a 70–30 basis during my visit last fall, but it is interesting to know that we continue to receive 90% of Ford business, due in all probability to the fact that we are considered 100% British, and of even more importance, we give Ford excellent service and have assigned one man to spend practically all of his time at Dagenham.

\* \* \* \* \* \*

"Both Mr. Dewar and Mr. Pascoe are watching the R. I. V. (Italian) situation very carefully and Mr. Dewar is keeping in constant friendly contact with Angellis, head of R. I. V. Our latest information is that the R. I. V. plant is very slack due to the let-down in Russian orders, and our British associates feel that they will use every means to sell this output at low prices, all over the world. This, of course, might affect us materially in South America and Canada where we have maintained good service prices, but it is the writer's opinion we shall have no great difficulty in the U. S. A. as long as the present tariff is maintained and with the depreciated dollar.

"As is generally known, we are members of the French anti-friction bearing cartel. This cartel was started in July 1932 and expires at the end of this year."

The cartel agreement between SKF and French Timken provided for a division of all of the French bearing business on a percentage basis, French Timken only participating in the tapered roller bearing market; SKF, in both ball and tapered markets.

As stated in the agreement, "In order to arrive at the allocation of the market as provided in as precise a manner as possible, an intimate commercial collaboration will be established between the two contracting parties, which will have to determine by agreement the tariff prices and discounts for the retail market, the prices and delivery dates quoted for all large orders or important customers." The parties agree to contact each other "at least every month" and to push the standardization of bearing sizes.

The cartel agreement between SKF and British Timken was not only an arrangement on prices of bearings and the percentage of the total bearings each was permitted to sell, but the parties agreed not to sell replacements of the other's bearings. The division of business as to specific customers was set up on a quota basis. When one of the parties exceeded its quota on a certain customer that party was required to raise its prices until there was compliance with the agreement.

The lengthy recital of letters, reports and memoranda paints such a clear picture of the conduct of the accused companies over the period of years, that the Court feels it serves the necessary purpose of pointing out the patent reasons for resolving the factual issues which are involved. It leaves no room for dispute or contradiction on the salient facts.

■ The evidence conclusively establishes to the satisfaction of the Court the assertions of the Government: that defendant, British Timken and French Timken have manufactured and sold during the period from 1928 to date a substantial portion of the world's production of anti-friction bearings and that they have imposed restraints on foreign commerce, by (1) allocating trade territories throughout the entire world each agreeing with limited exceptions not to manufacture or sell in the other's territory; by (2) fixing of prices on products sold by any party in the territory of the other party; by (3) mutual co-operation and assistance to protect each other's markets and to eliminate the competition of outsiders and by (4) participation in foreign cartels which restrict exports by United States producers.

The contentions that defendant stifled or eliminated competition and restrained trade, by exclusively exchanging present and future know-how and inventions, patented or unpatented, and by compulsory use of the trade mark "Timken" by British and French Timken, by prohibition against their dealing in products under any other name, and by requiring that they cease using that name upon the termination of the agreements, will be discussed later in this opinion.

The analysis of the evidence is susceptible of but one conclusion. It discloses an extensive and far reaching combination to smother all competition between defendant, British and French Timken and to stifle or suppress competition of other manufacturers by joint effort against them or by agreement with them.

It is readily seen that the present relationship of the parties is not only the culmination of the successive agreements beginning in 1928. The combination is, as well, the outgrowth of the principal agreements in 1909, when world markets were divided and competition was eliminated. Those contracts were not merely patent licenses for the manufacture of tapered roller bearings in limited areas, but they encompassed fields beyond the ambit of the existing patent rights. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525; United States v. National Lead Co., D.C., 63 F.Supp. 513, 523, affirmed, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852. The territorial restrictions applied to markets where defendant had no patent rights. Interstate Circuit, Inc., v. United States, 306 U.S. 208, 228, 59 S.Ct. 467, 83 L.Ed. 610. They included future development and inventions in the industry. United States v. National Lead Co., supra, Ethyl Gasoline Corp. v. United States, supra, Pope Manufacturing Co. v. Gormully, 144 U.S. 224, 12 S.Ct. 632, 36 L.Ed. 414.

After the expiration of the principal patents, the restrictions imposed continued. Without the benefit of the limited monopoly power of the patents the agreements followed the same pattern. They no longer revolved around the patents, but were without pretense contracts for the avowed purpose of suppressing competition. Duncan (Timken's London counsel) pointedly said in November 1927:

"As we understand the position, the main advantage derived by the English Company under the Agreement will be the advice and information to be received from you, the right to use the name 'Timken' and the absence of your competition. Do you not think that it would be better to accentuate these advantages in the Agreement, rather than leave them merely as incidents in a patent license?"

When in 1928 the American, British and French companies agreed to continue their activities, British Timken had grown from infancy in the bearing industry to a position of dominance and was a potential competitor with whom defendant had to reckon.

The relationship effected and maintained was not that which prevails between a manufacturer and its exclusive foreign agents for the distribution of its product. Each company was a manufacturer and distributor, independent of the others, but joined for the sole and only purpose of mutual benefits. It is not even contended that defendant, British Timken and French Timken ever competed.

The inflexible territorial limitations imposed by the parties on each other, which they violated only to prevent others from encroaching on the protected markets, were designed for the purpose of preventing competition and were reinforced by price agreements. The word "Timken" had become synonymous with tapered roller bearings. To lend support to the desire to eliminate the competition of other producers, defendant supplied British and French Timken, and them alone, with know-how in the production of bearings. It insisted that bearings produced and sold by them be identified by the name "Timken."

The cartel agreements in France, England and Italy were made by British Timken and French Timken with the knowledge, approval and co-operation of defendant to effectuate the plan of excluding competition of others in the territories of defendant, British and French Timken.

■ The extent to which they were successful in impeding competition is of no moment. It is sufficient that that was the end sought to be accomplished. Associated Press v. United States, 326 U.S. 1, 12, 65 S.Ct. 1416, 89 L.Ed. 2013; United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. The French Anti-Friction cartel, the English SKF-British Timken cartel and the agreements with Bock and R. I. V. fortified defendant in the overall plan of suppressing competition in the sale of tapered bearings.

■ It is an imperative of the Sherman Act that all combinations in restraint of international trade and all agreements to restrict competition be condemned. United States v. National Lead Co. supra, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 291; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. The very aim of all the anti-trust laws is to ban conduct and practices which destroy free and unhampered competition. That postulate has been repeatedly announced by the courts even before the legislative enactment. Within the last decades the decisions reiterating it have covered thousands of printed pages. They have been regarded as inimical to economic freedom. The Government refers to the instant combination as an international cartel, which appellation is assailed by defendant. That name applied to the combination has no significance, other than to label it as a pool of "separate firms to maintain prices above a competitive figure." (Webster's New International Dictionary). It is merely descriptive of the combined relationship between defendant, British Timken and French Timken. If the term connotes vice or illegality it is clearly applicable.

■ The strict allocation of markets to the members of a combination of competitors in the various parts of the world and the eradication of competition among them violates the Sherman Act. United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; United States v. National Lead Co., supra.

■ The contracts by which it was agreed that in a particular area anti-friction bearings might be sold by only one of the members of the combination, necessarily were intended to and had the effect of eliminating competition. The Supreme Court repeatedly recognized the inherent danger of such agreements to our system of free enterprise, and held that agreements or arrangements for dividing markets were illegal under the Sherman Act. United States v. American Tobacco Co., supra, United States v. Addyston Pipe & Steel Co., supra, United States v. National Lead Co., supra.

■■ The fact that defendant, British and French Timken were manufacturing and selling only tapered bearings does not immunize the combination against the operation of the antitrust laws. It is true that there is competition between tapered and other types of anti-friction bearings to the limited extent pointed out earlier. The prohibitions of the Sherman Act, however, are equally applicable to combinations in restraint of trade when only part of the commerce is stifled. As was said in Eastman Kodak v. Federal Trade Commission, 2 Cir., 158 F.2d 592, 594, certiorari denied 330 U.S. 828, 67 S.Ct. 869, 91 L.Ed. 1277:

"Hence it will not do to say that all film is in the same class. If a purchaser wants a color film he must be able to buy it from more than one manufacturer if there is to

be 'free and open competition with commodities of the same general class'; that he can buy a black and white film will not serve to destroy the monopoly of the sole producer of color film."

And in United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010:

"Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy."

And again in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225 (footnote 59), 60 S.Ct. 811, 845, 84 L.Ed. 1129, "And the amount of interstate or foreign trade involved is not material, Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608, since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected."

The benefits of a competitive price system under the Sherman Act would be lost to the vast number of manufacturers whose machinery and equipment are geared to use only tapered bearings, if the operation of the Act were to be construed otherwise.

■ The practice of selling only at prices agreeable to the party into whose territory the sales were made and the provisions of the contracts for agreed prices on replacement parts and the other price fixing arrangements of defendant, British and French Timken must be condemned as violations of the Sherman Act. United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

In United States v. Socony-Vacuum, supra, the Supreme Court said:

"Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.

· * * * * * *

"Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit

an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." (Footnote 59).

In United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 566, it was said:

"Price fixing in any form is perhaps the most powerful of all inducements for abandonment of competition. It offers security and stability; it eliminates much of the uncertainty of competitive practices; it promises high profits."

And again in United States v. Paramount Pictures, Inc., 334 U.S. 131, 143, 68 S.Ct. 915, 922:

"We start, of course, from the premise that so far as the Sherman Act is concerned, a price-fixing combination is illegal per se. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Masonite Corporation, supra. We recently held in United States v. United States Gypsum Co., 333 U.S. 364, [400], 68 S.Ct. 525, that even patentees could not regiment an entire industry by licenses containing price-fixing agreements."

■ Both the territorial sales limitations and price fixing constitute a menace to international trade in tapered bearings.

No less harmful and injurious to the unrestricted flow of commerce in tapered bearings was and continues to be the association of defendant, British and French Timken for the purpose of protecting each other's markets and the exclusion of outsiders from the tapered bearing market. Such conduct is denounced by the antitrust laws. Associated Press v. United States, supra, Montague & Co. v. Lowry, supra, Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.

■ The participation in the foreign cartels by defendant completed the circle within which the combination operated to forestall competition. The circumstances outlined above under which defendant took part in the operation of the cartels leave

no room for escape for defendant from the prohibitions of the Sherman Act. The ban on restraints of imports and exports has been consistently enforced by the courts. United States v. General Dyestuff Corp., D.C., 57 F.Supp. 642, United States v. Nord Deutscher Lloyd, 223 U.S. 512, 32 S.Ct. 244, 56 L.Ed. 531. What was so well said in United States v. National Lead Co., supra, 63 F.Supp. at page 524, is equally pertinent when applied to the facts in this case:

"The several agreements relating to manufacture and trade within the European markets are but some of the links in the chain which was designed to enthral the entire commerce * * *."

■ Nor does the fact that the cartel agreements were made on foreign soil relieve defendant from responsibility. United States v. Nord Deutscher Lloyd, supra. They had a direct and influencing effect on trade in tapered bearings between the United States and foreign countries.

There is no charge made in the complaint that the parties engaged in the practice of exclusively exchanging present and future know-how and inventions, patented or unpatented. Evidence seeking to establish such claim was offered at the trial. Although it does not convincingly appear that either the exclusive exchange of know-how or the enforcement of the trademark restrictions alone served as direct instruments to eliminate competition, they have been most helpful in buttressing other illegal conduct to achieve the desired result. They were integral parts of the general scheme to suppress trade.

Are the contentions urged by the defendant sufficient to overcome such manifest violations of the Sherman Act?

The first contention of defendant is that even if the agreements between the three Timken companies for division of territory, and any incidental arrangements as to price contained therein were made, any restraint resulting therefrom to constitute a violation of the Act, must be found to be unreasonable. Defendant's position is that it undertook to extend its activities by the purchase of British Timken and the formation of French Timken with Dewar. It protests that it was not done for the purpose of eliminating competition and that it did not have that effect, that there has been no intent to unduly restrain trade but that it was done for good business reasons. Defendant says the division of markets between the companies was reasonably ancillary to the acquisition of British Timken and the formation of French Timken.

In advancing the argument that only such contracts or combinations are within the condemnation of the Act as prejudice the public interest by unduly restricting competition or obstructing trade, defendant concedes that:

"It would appear, superficially, that contractual provisions like those involved in the case at bar that American Timken will not sell bearings in the territories of British and French Timken, respectively, and vice versa, tend to prevent competition between the parties."

■ The contention made invites a discussion of the rule of reason doctrine applied by the courts to the Sherman Act. A vast body of decisions may be found dealing with the doctrine. For the present purpose, it will suffice to say, that it is now firmly established that the statutory provision, "Every contract, combination * * * in restraint of trade * * * is hereby declared to be illegal * * *" means that all unreasonable restraints of trade offend the Act. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734. United States v. Columbia Steel Co., supra. It is equally well recognized that the determination of what constitutes unreasonable restraint is the province of the courts. Judicial construction of the law has declared certain restraints unreasonable. With but rare exceptions, since the decisions in the Standard Oil case and the American Tobacco case in 1911, activities which theretofore were stricken down as illegal restraints have been regarded since as unreasonable per se.

310

In view of the settled law and the facts, defendant's contention that the restraints were reasonable must be rejected as untenable. The restraints on commerce, here proved by abundant evidence, have been denounced as unreasonable per se.

Defendant seeks to draw a parallel between the instant facts and those in the Columbia Steel case, supra. By contradistinction from the facts in that case defendant, British Timken and French Timken are separate corporations who in their respective territories, both before and after their agreements, were potential competitors in the tapered bearing market. They were the largest dealers in tapered bearings in their respective territories. They occupied dominant positions in the entire anti-friction bearing industry. Defendant did not acquire British and French Timken.

The defense that the combination was formed without intent to restrain trade, for good business reasons, was denied validity in numerous cases. If good business reasons and expressions of good intent would serve as justifications for restraining trade and stifling competition the Sherman Act would render no aid to the free flow of commerce. The Act aims to bulwark the national economy and insists that individual interests give way to the benefit of all. Standard Sanitary Mfg. Co. v. United States, supra, 226 U.S. at page 49, 33 S.Ct. 9, 57 L.Ed. 107, Addyston Pipe & Steel Co. v. United States, supra, Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788.

There is nothing in the evidence to indicate a lack of intent to restrain trade. Indeed, all that the evidence discloses is an intent to form a smoothly operating combination to control commerce in the tapered bearing industry throughout the entire world.

In the face of the numerous agreements and the clear expressions of defendant's officers in the volumes of letters and memoranda offered in evidence, it is difficult to understand how anyone can disclaim a clear intent to restrict competition.

It is likewise difficult to place credence in the assertion that there was no intent to restrain trade when one reads the following comments of defendant's president, pertaining to domestic trade:[1]

"Louie Klinedinst and I were in New York last week and had a long talk with Fred Hughes and Lester Sigourney of New Departure and arrived at a mutually satisfactory selling price for flanged type bearings both ball and tapered roller. We held the price on these bearings at a point where a nice profit will be made for both companies, and I feel that we did a pretty good job as New Departure might have been out of line if we had not told them our prices, and in that event we should have had to cut our prices."

And

"All three of the principals involved agreed that the patent was not valid and that if any license was taken out it would be merely a move for legalizing the fixing of prices so that we would not be threatened by either the Clayton or Sherman laws."

It is next urged by defendant that any restraints imposed by the agreements were ancillary to the creation of a close relation between it and Dewar, analagous to a partnership or joint venture. It is suggested that the purpose was to expand its bearing business in European markets, and necessarily involved the investment of large sums in the acquisition and development of British and French Timken and hence not in violation of law. In this connection defendant assumes that since the parties could lawfully agree to be excluded from each other's territories, they could lawfully agree also that any incursions into each other's territories should be made only at prices agreeable to the party in whose territory the sale was made. It says that such a provision was reasonably ancillary to prevent competition by defendant with the corporations through which the common undertaking was conducted.

---

[1] Letter dated April 5, 1933, Umstattd to H. H. Timken.

Both the assumption made and the conclusion reached are wholly erroneous. The common undertaking was a joint venture only in the sense that they jointly undertook to continue the manufacture and distribution of bearings with all the limitations and restrictions which had theretofore been imposed. The joint venture was not ancillary to the agreement. Regardless of the descriptive term used to denote the affiliation, it did not constitute a legal basis for the avoidance of the consequences of the conduct which eliminated competition.

Throughout the trial great emphasis was placed on this phase of the defense. The record abounds with repetition of "joint venture," "partnership," "partnership in the layman's sense." All of the defendant's officers and employees took great pains to make reference time and again to "our joint venture" and to "our partners."

It will be recalled that the relationship of defendant, British Timken and French Timken in respect of the manufacture and sale of bearings did not originate with the agreement between defendant and Dewar. Ever since 1909 defendant had maintained the territorial market restrictions with the predecessors of British Timken, and in France with the predecessor of French Timken.

The agreements made in 1928 and the activities restricting commerce were antedated by other agreements and activities of similar nature. Licensing of patents first served as the basis for the restrictions, but they were continued despite the expiration of the patents. Although the question, whether the early agreements founded on patent ownership transgressed the law may not be in issue in this case, the fact that in their essence they set the pattern for the restraints, is of great and fundamental importance. The only substantial change in the relationship of the parties resulting from the Dewar-defendant contract was that defendant acquired a stock ownership in British Timken and French Timken. The execution of the 1928 contracts did not mark the beginning of new business contacts. They merely extended the restrictive arrangements which had existed for almost twenty years between potential competitors.

The only conclusion which may properly be drawn is that the restraints were not ancillary to the "joint venture." To the contrary, the arrangements were made to carry on effectively the combination to eliminate competition between the parties and to frustrate any competition of outsiders.

The underlying motive of Dewar for making the agreement which was recognized by defendant was Dewar's desire to escape defendant's competition and to continue the existing contracts.

Both British Timken and French Timken were managed and operated by Dewar. Except for such powers possessed by virtue of its stock ownership and the contracts, defendant had no control over the business conduct of either. While it is true that officers and employees of defendant visited the plants of the two foreign companies from time to time to give advice in respect of improved production and it is also true that technological information was supplied by defendant, all such assistance was in support of the combination to eliminate competition among the parties and with others.

British Timken and French Timken retained their corporate independence and jealously guarded their interests in dealings with defendant. A few years after the Dewar-defendant contract was made, Dewar asserted the "very separate and distinct entities of the various Companies concerned" and Hess abandoned, even in name, the partnership fiction when he wrote in October of 1934:

"* * * some of the things we formerly did willingly and freely, without any recompense, as affecting only our partner Michael Dewar, and ourselves, now becomes a matter of these same things being done for another company in which we hold a 25% interest only. Thus, as you will see from my various future letters, we feel it is quite desirable to definitely set up in our new agreements several points beyond question of a doubt that in the past would only be the occasion of a simple letter from either of us to each other, thus settling any divergence of. opinion in almost every instance."

In 1948 Dewar, when his depositions were taken in London, proclaimed: " 'Me' is British Timken."

It is quite obvious from these expressions of the officers of the respective companies that even if the stock investment of defendant and the co-operation between them indicated a pre-existent fiction of a "joint venture" or partnership in their own judgment, by 1934 neither believed that such relationship existed.

The facts are that defendant did not build plants in Europe or purchase subsidiaries abroad. It simply acquired substantial interests in a dominant manufacturer of bearings in England, participated in the formation of and invested in the stock of a potential competitor in France. The repeated assertion that it was in a joint venture or was a member of a partnership does not make it so.

■ Even if we were to assume, arguendo, that there was a "joint venture" between the parties and that an Ohio corporation could become partner in a business undertaking with a citizen of England or an English corporation, 10 Ohio Jurisprudence § 632, § 857, State of Ohio v. Standard Oil Co., 49 Ohio St. 137, 30 N.E. 279, 15 L.R.A. 145, 34 Am.St.Rep. 541, no immunity is afforded to defendant from the violations of the Sherman Act.

The argument is predicated on the oft quoted opinion of Judge Taft, later Chief Justice Taft, in Addyston Pipe and Steel Co., supra, in which restraints of trade resulting from a legal partnership agreement were held not to run afoul of the law. That decision does not uphold the type of conduct which is here attacked.

■ If a joint venture or partnership is formed for the purpose of a lawful business enterprise and restraints result from the right to protect established business interests no violation of law occurs. But if the association is formed for the purpose of continuing a combination to allocate exclusive sales territories in the world, to fix prices and to eliminate competition both within and without the combination, it cannot hide from the effects of the law under the cloak of a joint venture or partnership. Were it otherwise, an easy way could be found to circumvent the law by entering into agreements purportedly to protect a joint venture or partnership.

Defendant also asserts that any restraints imposed by the contracts were ancillary to its agreements to furnish know-how to British Timken and other Timken companies. It says that the covenants by which it agreed not to compete in the territory in which British and French Timken were to use this know-how and by which each of them in turn agreed not to compete in defendant's territory were reasonably ancillary to the sale of the know-how under the contracts. It concludes that the law permits the restriction not to compete in each other's territory as a recompense for its contribution to the foreign companies of advice and instruction in the manufacture of bearings and the quality of steel used and information with respect to inventions, discoveries and practices whether patented or not.

In taking this position it principally relies on the Addyston Pipe case, supra [85 F. 281]. It is pointed out that the agreements "by the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold" and "by the buyer of property not to use the same in competition with the business retained by the seller" were held in that case to be ancillary restraints not in violation of the Sherman Act.

Defendant goes so far as to argue "that, due to the more restrictive nature of a patentee's monopoly, he is more restricted in the conditions which he may impose, than is the seller of unpatented property such as know-how, which is available to any member of the public who can discover it" and "that the legal principle which supports a patentee's agreement not to sell in the licensed territory is just as applicable to one who licenses or transfers know-how."

The precise legal basis for the argument so advanced is not disclosed. Analogy is drawn between Fowle v. Park, 131 U.S. 88, 9 S.Ct. 658, 33 L.Ed. 67, and Dr. Miles Medical Company v. Park & Sons Company, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, and the instant case.

It must be noted at the outset of the discussion of the problem that the know-how furnished by defendant to the other companies was not a secret process for the manufacture of tapered roller bearings. Other manufacturers were admitted to the plants of British and French Timken, where they could observe all the know-how put into operation. In the extensive record of the testimony dealing with the assistance given by the officials and technical staff, there is no trace of any secret process which was imparted by them. No contention was made at any time that such was the case. The know-how consisted of designs, data showing how defendant manufactured its product, the advice of defendant's employees and help of like nature.

Reference is made to a patentee's right to impose restrictions in respect of the patented products.

 The patent monopoly is so circumscribed as not to be an instrument in restraint of trade to a greater extent than is consistent with the privileges granted. The proposition of law has been firmly established that the patent does not empower its owner to restrain trade in processes or devices which are not embraced within the scope of his patent. United States v. Line Material Co., supra, Standard Sanitary Co. v. United States, supra, United States v. United States Gypsum, supra. The law has too jealously guarded the benefits derived from a free flow of commerce to permit even the reward for the development of the useful arts and sciences to be greater than essential to encourage inventions.

The limitations imposed by the judicial opinions on the use of patents to restrain trade are too well-known to justify a lengthy discussion of them. Those opinions only serve as guide posts to resolve the question here presented.

In order to sustain the argument of defendant, this Court is asked to find that one who transmits his skill in the manufacture of a product to another is entitled to a greater reward than one who is instrumental in the advancement of science by his inventive genius. Such finding would be obviously wrong.

In Ethyl Gasoline Corp. v. United States, supra, 309 U.S. at page 456, 60 S.Ct. 618, 625, 84 L.Ed. 852, the court said:

"He may not, by virtue of his patent, condition his license so as to tie to the use of the patented device or process the use of other devices, processes or materials which lie outside of the monopoly of the patent licensed".

 During the existence of the tapered bearing patents defendant could not legally allocate markets on processes which were not within the ambit of its patent monopoly. Therefore, it defies all sense of logic to say that upon the expiration of the patents defendant could lawfully engage in like conduct and practices upon the theory of supplying know-how on unpatented processes.

One who possesses greater knowledge or superior skill in the manufacture of a product is entitled to be fairly and adequately compensated if he furnishes his knowledge or skill to others. He is not entitled, however, to exact as a price for such contribution, complete freedom from competition. The quid pro quo for furnishing of know-how cannot be an absolute license to avoid the provisions of the Sherman Act. The harm caused thereby would be too great a tribute to knowledge and skill when viewed in the light of public policy.

It would seem that after the lapse of years since the passage of the Sherman Act, every type of economic venture has been under the scrutiny of judicial eyes to determine whether it clashes with the mandate of the Act. The ingenuity of business enterprise, however, makes it inevitable that new practices be examined as they arise. So in this instance a phase of business conduct must be weighed in the light of the general principles of the antitrust laws without the benefit of specific decisions for guidance.

We are, here, confronted with a situation wherein a patentee, upon the expiration of its patent monopoly, seeks to justify the perpetuation of the favored position it enjoyed by virtue of the patent through the ingenious theory of furnishing know-how. If lawful restraints and monopolies

could be predicated on the ownership of know-how they could last ad infinitum. This Court cannot subscribe to such unharnessed privilege.

The contracts to divide the world into exclusive marketing areas cannot be defended as ancillary to the transfer of know-how by defendant.

The next contention advanced by defendant is, that if any restraints were imposed by the Business Agreements, they were ancillary to the licensing of the trade mark "Timken" to British and French Timken and therefore were not contrary to law.

Neither factual nor legal justification may be found to give merit to the contention.

Defendant maintains that the objectives which it desired in 1928 to achieve in respect of the mark were:

"(1) The affirmation of its equitable ownership of the mark in England and in various portions of the British Empire.

"(2) The disposition of the French and German trade-mark problems to the end that it would ultimately become the owner of the trade-mark registrations in those countries.

"(3) The removal of any possibility of challenge to it of its registrations in certain European countries wherein, as has been shown, they could be questioned on the basis of prior use.

"(4) The establishment of a reversionary right in it in the mark on termination of the contract with the British and French Companies."

It is readily discernible from the recital of these objectives that defendant had serious doubt of its ownership of the mark in 1928 in the various territories assigned to British and French Timken. In fact in some markets British Timken's predecessor was the owner of the mark. In France S. M. G. had registered it. In Germany one Prausnitzer was the sole owner of the trade mark "Timken." It is apparent from the testimony that defendant could not use the mark in a great portion of the world.

At that time defendant was primarily concerned, therefore, not in safeguarding the trade mark rights which it then possessed, but rather in acquiring the rights obtained by other manufacturers, as a consequence of the early patent license agreements, in areas where defendant had agreed not to manufacture and sell. Its own covenants not to make or sell bearings in territories allotted to others brought about the situation that the trade mark "Timken" was registered and owned by others.

Defendant's assertion that it was the sole equitable owner of the mark is unimpressive. The agreements attempted to remedy its dubious trade mark rights.

Its own counsel in England forcibly brought the matter to defendant's attention in a letter on April 2, 1927, as follows:

"We are glad to note that you are endeavoring to obtain a controlling interest in British Timken. This is in line with our own suggestions and will put you in control of the trade-mark "Timken" all over the world, whereas, under existing conditions, there is a danger that, if your present license agreement with British Timken should be terminated, you might not be able to prevent others from establishing a right to use the word "Timken" in certain countries from which you are excluded by the agreement from doing business."

Despite counsel's optimism concerning world control of the mark, great difficulty was encountered in effecting registration in many countries.

It is true that from the inception of the business dealings with foreign producers and distributors, defendant scrupulously guarded its right in the trade name. Every agreement contained a provision that on all bearings sold, the name "Timken" be affixed. It is also true that the officials of defendant impressed company counsel with the importance of the preservation of the trade mark. But the trade mark provisions of the challenged contracts were subsidiary and secondary to the central purpose of allocating trade territories, specifically recited in them as follows:

"The Companies parties hereto for their mutual advantage and convenience in working have agreed to make arrangements for an interchange between them of information and facilities and in connec-

tion therewith to define their respective territories and for other purposes in manner hereinafter appearing."

The evidence conclusively proves that defendant entered into the agreements not for the purpose of exercising its right to protect the trade mark "Timken" from its unlawful use by British and French Timken nor to protect the public from British or French Timken passing off their products as those of defendant, but for the purpose of preventing competition in the sale of bearings. Through the years 1909–1924, defendant enjoyed freedom from competition, because of its patent monopoly. It now attempts to defend the extension of this right on the basis of granting British and French Timken the use of its trade mark.

Assuming that the restraints were reasonably ancillary to protect the trade mark· and that the law sanctions such ancillary restraints, defendant's contention nevertheless is founded on the tenuous premise that it was the equitable owner of the mark outside of the marketing territory allocated to it.

Defendant did not and could not have a right to license a trade mark in markets where it did not own the mark.

Defendant maintains that the trade mark is its property; that the ownership of any property is in a limited sense monopolistic; that in the exercise of such a limited monopoly power, defendant has the right to exact as a consideration for the use of its property, an agreement with others not to compete.

The conflict between the Sherman Act and the limited patent monopoly has been the subject matter of innumerable litigated cases. The courts have attempted to harmonize the opposing basic policies inherent in their respective economic concepts. They tried to fit the antitrust laws within the frame work of the constitutional grant of a patent monopoly. Whether within the provisions of the Sherman Act commerce

may be restrained to the extent that it is reasonably ancillary to protect a trade mark has not been decided or discussed by the courts.

Trade marks in our economic system provide the method by which one seller may be enabled to distinguish his goods from those of another. Fundamentally the basic function of the law pertaining to trade marks is to safeguard the good will of one manufacture or distributor against the sale of another's merchandise as his. Canal Co. v. Clark, 13 Wall. 311, 80 U.S. 311, 20 L.Ed. 581, Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713. The right to protect it is bestowed by the law not only to reward business enterprise and prevent piracy on successful and established ventures, but at the same time to prevent deception of the public into believing that they are purchasing one product instead of another.

The trade mark right as all other rights is not without bounds. The owner's rights are canalized within the exercise of the trade mark's accepted and defined functions. The law is replete with decisions which set out their functions and limitations.[2]

Some of them are lucidly delineated in United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97-98, 39 S.Ct. 48, 50, 63 L.Ed. 141, as follows:

"The asserted doctrine is based upon the fundamental error of supposing that a trade-mark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy. Canal Co. v. Clark, 13 Wall. 311, 322, 20 L.Ed. 581; McLean v. Fleming, 96 U.S. 245, 254, 24 L.Ed. 828. There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair com-

---

[2] Whatever extension of trade mark rights is encompassed in the Lanham Trade-Mark Act, Title 15 U.S.C.A. § 1051 et seq., its enactment did not open the door to employ a trade mark as an instrument to undermine the antitrust laws. This is borne out with transparent clarity by its legislative history.

petition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. Hanover Milling Co. v. Metcalf, 240 U.S. 403, 412–414, 36 S.Ct. 357, 60 L.Ed. 713.

"The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly. See United States v. [American] Bell Telephone Co., 167 U.S. 224, 250, 17 S.Ct. 809, 42 L.Ed. 144; Bement v. National Harrow Co., 186 U.S. 70, 90, 22 S.Ct. 747, 46 L.Ed. 1058; [Continental] Paper Bag Patent Case, 210 U.S. 405, 424, 28 S.Ct. 748, 52 L.Ed. 1122.

"In truth, a trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package in which it is sold."

■ In order to resolve the instant question all that need be said is that the trade mark right is not comparable to the right the owner has in a chattel or realty; it is not a right in gross or at large; it is not such a right as is awarded to an inventor in the product of his invention. United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1302, 86 L.Ed. 1778.

Even the patent monopoly is not broad enough to encompass the power to engage in conduct and practices to eliminate competition such as were employed by defendant, British and French Timken. United States v. National Lead, supra, United States v. Line Material Co., supra, Hartford-Empire v. United States, 323 U.S. 386, 433, 65 S.Ct. 373, 89 L.Ed. 322; Mercoid v. Mid-Continent Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376; Standard Sanitary Co. v. United States, supra, United States v. Gypsum, supra, Ethyl Gas v. United States, supra, United States v. Masonite Corp., supra, Federal Trade Commission v. Beech-Nut Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Interstate Circuit v. United States, supra, United States v. Paramount Pictures, 334 U.S. 131, 143, 68 S.Ct. 915 (see note 12).

A trade mark is not the product of invention. The privileges which are accorded to the owner of a patent are predicated upon invention and are safeguarded to carry out the Constitutional intent to promote the progress of science and the useful arts. If a trade mark were to be given the power of monopoly, it would not be limited in time as in the case of a patent. The public would not benefit from an invention and there would not be the ultimate gain which flows from the disclosure of a patent. That is the foundation for the patent monopoly.

A trade mark brands a product as to its origin. The law empowers the owner or the originator of a mark to protect his wares against the imitator who seeks to palm off merchandise as his by the use of the same mark. He is given the right to enjoin such practices. The public interest is served by that protection which in the exercise of all rights is paramount. Deception is prevented.

The trade mark may become a detrimental weapon if it is used to serve a harmful or injurious purpose. If it becomes a tool to circumvent free enterprise and unbridled competition, public policy dictates that the rights enjoyed by its ownership be kept within their proper bounds. If a trade mark may be the legal basis for allocating world markets, fixing of prices, restricting competition, the unfailing device has been found to destroy every vestige of inhibition set up by the Sherman Act. The rights pertaining to trade marks and trade names were well known long before that legislative enactment was passed by Congress. It is certain that it was never intended that the consequences of violations of the antitrust laws may be escaped by the licensing of trade marks.

Defendant vigorously asserts its position, that since exports and imports of anti-friction bearings from and into the United States in foreign commerce over the years have been relatively insignificant,

an injunction to prevent the alleged restraints would be a vain and needless gesture on the part of the Court. The basic purpose of the Sherman Act, it says, is to insure trade on a competitive price basis. The argument goes that inasmuch as there is no price competition in bearings imported into or exported from the United States, and since it is impossible for American manufacturers or foreign manufacturers to engage in the exporting or importing of bearings to each other's markets on a successfully commercial basis, the illegality which is essential to the granting of equitable relief does not exist.

Several days were devoted, in the trial of the case, to defendant's effort to sustain this contention. Tables of figures were offered in addition to the statements of defendant's officials, to prove that the volume of exports and imports in tapered roller bearings was negligible. Whether the absence of trade was the result of the competitive restrictions charged by the Government or of natural economic forces was not pointed out.

Several witnesses testified that the economic dislocation of world markets precipitated by the first world war, and the depression which followed, caused a near chaotic condition in foreign commerce. It was augmented, they said, by the policies of the various nations to encourage purchase of domestic goods. The "Buy British" slogan was mentioned as illustrative of this program, in which nearly all countries engaged. The tariff regulations, the formation of the sterling bloc, the fluctuation of currency values, the government restrictions against imports and exports also contributed to the net result, they maintained, that producers were unable to compete with foreign manufacturers on a profitable basis. They concluded that this condition has prevailed not only in the roller bearing industry, but it affected all industries.

In the consideration of this claim the question immediately arises: If all the impediments to foreign trade existed ever since 1914, which became more and more pronounced to the present day, why were the contracting parties, defendant, British Timken and French Timken so concerned about air-tight agreements to keep each one within its own commercial domain? The repeated and persistent provisions of the successive contracts, for territorial restrictions, contradict any claim of lack of ability to compete.

Local and national pride in domestic goods and sales resistance to foreign made products have always been obstacles to import and export trade. The ingenuity of the American businessman, fortified by the advantages of free competition, in many instances has been able to penetrate the strongest tariff walls.

The evidence bears out the fact that there was and there is actual and potential competition in the international roller bearing market. The contracts were consummated for the very purpose of regulating and restricting it.

How else could this portion of Dewar's testimony be explained:

"Q Is it your intention to say that it was immaterial to you who sold as between American Timken and British Timken at all times, or just when you were in competition with S.K.F.?
A Our main object in life was to sell Timken tapered roller bearings. Naturally, I did not want the American Timken Company to sell bearings in our territory unless—well, in our territory.

"Q In other words, you did not mean that as between a bearing made in Canton and one made in Birmingham, you did not care which was sold in your territory—they both have the name 'Timken' on them?
A Yes.

"Q But you are interested in selling bearings made in Birmingham in your territory? A Yes, certainly; but if we were unable to sell a bearing made in Birmingham, we preferred to sell in our territory a bearing made in Canton or in France rather than a S.K.F. bearing made in Gothenburg.

"Q So in other words, if you were trying to get the business from S.K.F., it was then that it was immaterial to you which Timken bearing was sold? A Well, I should have put it the other way around:

it was when S.K.F. was trying to get the business from us. After all, we started.

"Q You used the phrase 'common enemy' referring to Swedish S.K.F. Were they a common enemy at all times, or were they not during some time? A They were a common enemy all the time.

"Q And they were a common enemy at the time you entered into the arrangements in France in 1934, and the arrangements in England in 1932? A They were largely a common enemy from the time we ever heard of them up to now inclusive.

"Q So that they were a common enemy with whom you had friendly arrangements? A We occasionally had a truce—like the Russians and the Germans."

and that of William R. Timken:

"Q Now, you said Mr. Dewar wanted to know where he stood. A Yes.

"Q In what respect? Would you be a little more explicit? A Well, he wanted to know where his—what he was putting his money into. He didn't want to get into a dog fight with us.

"Q About territories in which to sell bearings, you mean? A Yes, it would hardly be economical to support two sets of distributors in the same country, for instance. Therefore, he wanted a clear understanding of what territories his company would serve."

It is not purely conjecture to conclude, that had it not been for the rigid restrictions provided in the contracts and their strict enforcement in actual practice, the volume of business with foreign countries would have been considerable in size. The officers of defendant admitted that the need for bearings from the United States was continuously shown by the inquiries made by foreign purchasers. Small competitors of defendant in the United States were able to make shipments abroad on a rela-

tively large scale. The last war accentuated the demand, but defendant adhered to its obligation as a member of the combination and refused to make sales. Forsythe's report to Klinedinst:

"We have received definite orders from their sales territories which upon being referred to British Timken were turned down at their instructions"

is convincing evidence of the potential competition and the destructive effect of the combination.

Political and social changes have repeatedly caused fluctuations in international trade. Our own economy has always been affected by the currents of trade regulations abroad. But violent as the variations have been, commerce with foreign nations has remained one of the great influences on our own economic welfare. The provisions of the Sherman Act, pertaining to free competition with other nations, have not become a dead letter as a consequence of the world events of the past thirty-five years.

The evidence presented is convincing that defendant, British Timken and French Timken have formed a world cartel in tapered roller bearings. They have divided the world into exclusive sales territories. They have fixed prices. They agreed to and have effectively eliminated competition among themselves. They agreed to and did attempt to eradicate the competition of outsiders. They combined with competitors to fix prices. The defenses offered do not constitute justifications for such patent violations of the antitrust laws.

The Government is entitled to a decree. The exact nature of the needed remedy to prevent future violations will be determined at a hearing set for that purpose.